RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0356p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MAURICE A. MASON,

　　　　　　　　*Petitioner-Appellant,*

　　*v.*

BETTY MITCHELL,

　　　　　　　　*Respondent-Appellee.*

No. 05-4511

>

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-00524—David A. Katz, District Judge.

Argued: November 28, 2007

Decided and Filed: October 3, 2008

Before: BOGGS, Chief Judge; MOORE and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** David C. Stebbins, LAW OFFICES, Columbus, Ohio, for Appellant. Adam Michael Van Ho, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** David C. Stebbins, LAW OFFICES, Columbus, Ohio, Carol A. Wright, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Carol Ann Ellensohn, Matthew C. Hellman, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. BOGGS, C. J. (pp. 18-22), delivered a separate dissenting opinion.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. This case returns to us following the district court's denial of Petitioner-Appellant Maurice A. Mason's ("Mason") petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. In *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003) ("*Mason I*"), we remanded this case to the district court with instructions to hold an evidentiary hearing regarding Mason's claim that he received ineffective assistance of counsel at the sentencing phase due to his counsel's failure to conduct a reasonable investigation into his family background. After holding an evidentiary hearing on December 29 and 30, 2003, and January 6, 2004, the district court issued a Memorandum Opinion and Order denying Mason's petition on October 31, 2005. *Mason v. Mitchell*, 396 F. Supp. 2d 837 (N.D. Ohio 2005) ("*Mason II*") (Joint Appendix ("J.A.") at 379-413). Although Mason's counsel reviewed records provided by the state that contained some

1

references to violence and drug use in the Mason family home during Mason's childhood, Mason's counsel failed to investigate Mason's background and essentially conducted no interviews of any of Mason's family members prior to settling upon a plan for the sentencing phase that was limited to appeals for mercy and claims of residual doubt. We hold that trial counsel provided ineffective assistance by failing to interview Mason's family members and investigate the obvious red flags contained in state records suggesting that Mason's childhood was pervaded by violence and exposure to drugs in the home from an early age. Accordingly, we **REVERSE** the judgment of the district court, **GRANT** Mason a conditional writ of habeas corpus that will result in the vacation of his death sentence unless the state of Ohio commences a new penalty-phase trial against him within 180 days from the date that the judgment in this matter becomes final, and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

**A. Facts**

In *Mason I*, we summarized the factual background of this case as follows:

On February 8, 1993, Robin Dennis ("Robin"), the nineteen-year-old wife of Chris Dennis ("Chris"), disappeared. Earlier that day, Robin and Chris had socialized with Mason and other friends, and Chris and Mason had discussed trading Chris's .22 caliber Colt Frontier Scout revolver for Mason's television. The next day, Robin was reported as missing to the Union County Sheriff's Department; the report stated that Mason was the last person seen with Robin.

On February 10, 1993, Deputy Sheriff Jack Lautenslager ("Lautenslager") received a report about an abandoned car in a rural area of Marion County. Two days earlier, Lautenslager had driven through that area and seen a black man walking, whom he later identified as Mason. Chevron-style shoe impressions, similar to those made by shoes that Mason and Robin owned, were found on the outside of the passenger door and on the passenger's side of the dash. Type-B blood, Robin's blood type, was found on the inside of the passenger door. A set of keys, including car keys that fit a 1981 Chrysler owned by Mason's wife, was on the car's front passenger seat.

A few hours after this discovery, Dennis Potts ("Potts") of the Marion County Sheriff's Department questioned Mason about Robin's disappearance. This interview took place at the detective's office of the Sheriff's Department and lasted for eighteen minutes. On February 12, 1993, following up on information from other interviews, Potts questioned Mason again. The second interview took place in a basement interrogation room and lasted, with pauses in the questioning, for four hours. Mason appears to have understood that he was not under arrest at this time. After the second interview, Mason's parole officer took him into custody for a parole violation.

On February 13, 1993, Robin's body was found inside an abandoned building that was within eighteen minutes' walking distance from where her car had been found. She was lying face down, wearing only a bra; her jeans and underwear were pulled down to her ankles. Robin's T-shirt and car keys were under her jacket, which was found eight feet from her body with burrs and debris on it. The apparent murder weapon, a blood-stained board with protruding nails, was found twenty feet from her body. Another piece of wood found at the scene had strands of hair that matched Robin's hair. On February 15, 1993, detectives found a small blood-stained piece of metal at the crime scene, which a firearms examiner later concluded was identical to a grip-frame from a .22 caliber Colt Frontier Scout revolver and was consistent with having come from the handle of such a revolver.

On February 14, 1993, pathologist Dr. Keith Norton ("Norton") conducted an autopsy and concluded that Robin had died as a result of blunt force trauma causing multiple skull fractures. Dr. Norton determined that the blood-stained board found at the scene and the butt of a revolver could have caused Robin's injuries. Dr. Norton also found sperm in Robin's vagina that DNA experts later matched to Mason's DNA. DNA material from Robin's underwear also matched Mason's DNA. The experts did not find DNA from anyone other than Robin and Mason.

*Mason I*, 320 F.3d at 611-12 (footnotes omitted).

## B. Procedural History

Our prior decision and the district court's decision after our remand both recount the procedural history of this case, *see Mason I*, 320 F.3d at 612-13; *Mason II*, 396 F. Supp. 2d at 840-42, and we draw upon those decisions in our summary here.

In September 1993, Mason was charged with (1) aggravated murder, with a death penalty specification that the murder occurred during the commission of a rape; (2) rape, with a prior aggravated felony specification; and (3) having a weapon while under disability, with an offense of violence specification. In October 1993, after finding that Mason was indigent, the trial court appointed Lawrence A. Winkfield ("Winkfield") of Columbus, Ohio, as lead counsel and Ted I. Coulter of Marion, Ohio, as co-counsel in charge of the mitigation phase.

In December 1993, Mason was reindicted on the same charges, with a firearm specification added to each count, and Mason pleaded not guilty. Mason's jury trial began on May 31, 1994, and concluded on June 18, 1994, when the jury found Mason guilty on all three counts.

On June 27, 1994, the trial entered the sentencing phase, and the court held a mitigation hearing in the presence of the jury. Mason's counsel presented the testimony of two deputy sheriffs from the Marion County Jail Division, who testified regarding Mason's good behavior during his time in incarceration pending trial. J.A. at 712-19 (Tr. at 4237-44). Mason's counsel presented brief testimony from Ruby Mason, Mason's mother, as well as his brother, sister, and cousin. The family members asked the jury to show mercy and to spare Mason's life. J.A. at 720-27 (Tr. at 4245-52). Terry Mason, Mason's wife, then testified, and she pleaded for mercy and displayed for the jury some drawings that Mason had made for her while incarcerated. J.A. at 727-30 (Tr. at 4252-55). On cross-examination, the prosecution questioned Terry Mason regarding her memory of events on the day of the murder. J.A. at 730-40 (Tr. at 4255-65).

Finally, Mason made an unsworn statement on his own behalf, in which he denied killing Robin Dennis and asked the jury to sentence him to one of the two life sentences so that he could have "the chance to take [his case] through the Appeals Courts." J.A. at 754-57 (Tr. at 4279-82). At that point, the defense rested and the prosecution did not offer any evidence in rebuttal.

The trial judge then instructed the jury regarding the three possible sentences that it could impose: (1) a sentence of death; (2) a sentence of life imprisonment with eligibility for parole after thirty years; and (3) a sentence of life imprisonment with eligibility for parole after twenty years. *See* J.A. at 762 (Tr. at 4287). After approximately four and one-half hours of deliberation, the jury sent a question to the court, stating that "[w]e're unable to reach a unanimous decision on any one of the sentencing options." J.A. at 822 (Tr. at 4370); *State v. Mason*, 694 N.E.2d 932, 954-55 (Ohio 1998). The trial judge then gave the jury an additional instruction about further deliberations and asked whether there was a possibility that the jury might reach a verdict after an additional period of time. J.A. at 822-24 (Tr. at 4370-72). The foreman initially answered "No," but he agreed to discuss the possibility of continuing deliberations with the other jurors. *State v. Mason*, 694 N.E.2d

at 955. Then, "[a]t 5:00 p.m., the jury sent a note that they had made 'some progress' and that it was 'best to adjourn for the evening & resume fresh in the AM.'" *Id.* After deliberating for approximately thirty minutes the next morning, June 29, 1994, the jury indicated that they had reached a unanimous verdict. *Id.* The jury's verdict was a recommendation that Mason receive a sentence of death.

On July 15, 1994, the trial judge accepted the jury's recommendation and sentenced Mason to death for aggravated murder. J.A. at 831-32 (Judgment at 1-2). "On August 9, 1994, the trial court heard argument on and then denied Mason's motion for a new trial." *Mason I*, 320 F.3d at 613.

Mason filed a timely appeal in which he raised twenty-four issues, and the Ohio Court of Appeals for the Third Appellate District affirmed his conviction and sentence. J.A. at 833-55; *State v. Mason*, 1996 WL 715840, No. 9-94-45 (Ohio Ct. App. Dec. 9, 1996). Mason then appealed to the Ohio Supreme Court, which also affirmed Mason's conviction and death sentence. J.A. at 862-876; *State v. Mason*, 694 N.E.2d 932 (Ohio 1998). The Supreme Court of the United States denied Mason's petition for a writ of certiorari on December 14, 1998. *Mason v. Ohio*, 525 U.S. 1057 (1998).

## C. Procedural History—Post-Conviction

In *Mason I*, we summarized the course of Mason's state collateral attack on his conviction and sentence as follows:

> While his direct appeal was pending, Mason filed a state collateral attack in the Court of Common Pleas of Marion County, asserting seven assignments of error. *State v. Mason*, 1997 WL 317431, at *1 (Ohio Ct. App. June 6, 1997). On November 21, 1996, the court denied relief without holding an evidentiary hearing. *Id.* Mason appealed the dismissal of his post-conviction petition to the Court of Appeals for the Third Appellate District, which affirmed the judgment of the Court of Common Pleas on June 6, 1997. *Id.* at *7. Mason then filed a timely appeal to the Ohio Supreme Court, which dismissed the appeal on October 15, 1997, as not involving any substantial constitutional question.
>
> On July 15, 1999, Mason filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising twenty-five challenges to his conviction and sentence. On May 9, 2000, the district court denied Mason's habeas petition and his motion for an evidentiary hearing on various claims. *Mason v. Mitchell*, 95 F.Supp.2d 744, 795 (N.D. Ohio 2000). The district court subsequently granted a certificate of appealability as to all claims.

*Mason I*, 320 F.3d at 613.

Our decision in *Mason I* remanded Mason's claim of ineffective assistance at the sentencing phase to the district court for an evidentiary hearing but otherwise affirmed the district court's denial of Mason's petition.

## D. The District Court's Evidentiary Hearing on Remand

The district court held an evidentiary hearing on December 29 and 30, 2003, and on January 6, 2004. The district court issued a Memorandum Opinion and Order denying Mason's petition on October 31, 2005. *Mason II*, 396 F. Supp. 2d 837 (N.D. Ohio 2005). The district court provided a thorough summary of the evidence and testimony presented at the hearing. *Mason II*, 396 F. Supp. 2d at 842-49, and we will discuss the evidence developed at that hearing as relevant to our analysis below.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's determinations regarding a habeas petitioner's claim of ineffective assistance of counsel. *Higgins v. Renico*, 470 F.3d 624, 630 (6th Cir. 2006). We review any factual findings made by the district court for clear error. *Moss v. Hofbauer*, 286 F.3d 851, 858 (6th Cir.), *cert. denied*, 537 U.S. 1092 (2002).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), governs our review of a state court's determination of Mason's claim because he filed his petition for a writ of habeas corpus after AEDPA's effective date. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Terry Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[C]learly established law under [AEDPA] encompasses more than just bright-line rules laid down by the [Supreme] Court. It also clearly includes legal principles and standards enunciated in the Court's decisions." *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir.), *cert. denied*, 537 U.S. 1007 (2002). "The lack of an explicit statement" of a rule "is not determinative" because "[t]he Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent." *Id.* at 852; *see also Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007) ("AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'") (quotation omitted).

### B. Clearly Established Federal Law Regarding Ineffective Assistance of Counsel at the Sentencing Stage

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), provides "the legal principles that govern claims of ineffective assistance of counsel." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Claims of ineffective assistance of counsel have "two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Id.* The Supreme Court assesses performance using an "objective standard of reasonableness" and "prevailing professional norms." *Strickland*, 466 U.S. at 688.

In this case, as in *Strickland*, *Williams*, *Wiggins*, and *Rompilla v. Beard*, 545 U.S. 374 (2005), Mason's "claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence" to be presented at the sentencing phase of a capital trial. *Wiggins*, 539 U.S. at 521; *Rompilla*, 545 U.S. at 380-81. In *Williams v. Taylor*, the Supreme Court "concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 522 (quoting *Williams*, 529 U.S. at 396) (alteration in original).

The Supreme Court has also emphasized that in analyzing a claim that counsel provided ineffective assistance by failing to investigate mitigating evidence, the "principal concern . . . is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 522-23. Likewise, the Supreme Court has instructed that "[i]n assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also *whether the known evidence would lead a reasonable attorney to investigate further*." *Wiggins*, 539 U.S. at 527 (emphasis added). Therefore, even if counsel "limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Id.* Finally, in assessing the reasonableness of counsel's investigation, the Supreme Court has cautioned that courts must avoid "hindsight" and that our analysis should "include[] a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Id.* at 523 (quoting *Strickland*, 466 U.S. at 689).

As to showing the second *Strickland* prong of prejudice in the sentencing context, the Supreme Court has explained that a petitioner may demonstrate prejudice by establishing that "there is a reasonable possibility that at least one juror would have struck a different balance" had Mason's counsel uncovered and presented additional evidence of Mason's background. *Wiggins*, 539 U.S. at 537; *State v. Brooks*, 661 N.E.2d 1030, 1042 (Ohio 1996) ("[A] solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors."). The Supreme Court has specifically observed that "the graphic description of [a defendant's] childhood, filled with abuse and privation, . . . might well have influenced the jury's appraisal of his moral culpability." *Williams*, 529 U.S. at 398.

## C. Mason's Claims of Ineffective Assistance of Counsel

Mason attacks the performance of his counsel in several related ways, but the crux of his challenge is that his counsel provided ineffective assistance because they failed to investigate his background and conduct any in-depth interviews of his family members prior to the decision on June 22, 1994, to limit the mitigation presentation to appeals for mercy and claims of residual doubt. Mason further contends that counsel's deficient performance prejudiced him because subsequent investigation has revealed significant additional information about Mason's childhood that might have humanized him to the jury—which had initially deadlocked regarding his sentence—and persuaded at least a single juror that the death penalty was not an appropriate sentence. Finally, we must consider whether the Ohio Supreme Court unreasonably applied clearly established federal law in adjudicating Mason's claim of ineffective assistance of counsel.

We agree with Mason on all three issues, and we analyze each in turn in the following sections.

### 1. Whether the Performance of Mason's Counsel Was Deficient

In light of the Supreme Court's decisions regarding what constitutes a reasonable investigation of mitigating evidence at the sentencing stage—and of the circumstances that trigger counsel's obligation to investigate further—it is clear that the performance of Mason's counsel was deficient and objectively unreasonable. The testimony presented at the evidentiary hearing[1] established that Coulter, who was responsible for handling the mitigation phase of Mason's trial, selected his strategy for the mitigation hearing during the course of a 75-minute telephone call with members of the Ohio Public Defender's Office on June 22, 1994, just days prior to the mitigation hearing itself, which took place on June 27, 1994.[2] J.A. at 1599-1604; J.A. at 1629; J.A. at 1721-22; Resp. Br. at 56. Therefore, the evaluation of Coulter's performance must focus on what knowledge Coulter then possessed regarding Mason's childhood and background and what investigation and interviews, if any, that Coulter had performed prior to making that decision. *See Wiggins*, 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.").

Before analyzing Coulter's investigative activities prior to June 22, we first outline the minimum standards that the Supreme Court has established for such investigations. The Supreme Court has described "the standards for capital defense work articulated by the American Bar Association (ABA)" as "standards to which we long have referred as 'guides to determining what is reasonable.'" *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688). The edition of those standards current at the time of Mason's trial "provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Id.* (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (2d ed. 1989)).

The Supreme Court's opinions in *Wiggins* and *Rompilla* offer particularly instructive examples of how to analyze an attorney's investigation into mitigating evidence. In *Wiggins*, the Supreme Court noted that Wiggins's counsel reviewed state-provided records that revealed his mother's chronic alcoholism, his history of shuttling among foster homes, his frequent and lengthy absences from school, and an instance in which his mother abandoned him and his siblings for days without food. *Wiggins*, 539 U.S. at 525. However, the Supreme Court held that Wiggins's "[c]ounsel's decision not to expand their investigation beyond the [state] records fell short of the professional standards that prevailed in Maryland in 1989" because "any reasonably competent attorney would have realized that pursuing these leads [revealed in the state records] was necessary to making an informed choice among possible defenses." *Id.* at 524-25. Observing that "the Maryland Court of Appeals appears to have assumed that because counsel had *some* information with respect to petitioner's background—the information in the [state] records—they were in a position to make a tactical choice not to present a mitigation defense," the Court characterized the

---

[1] Mason's other counsel was Winkfield, who primarily handled the guilt phase of Mason's trial and testified at the evidentiary hearing that he never interviewed any member of Mason's family regarding Mason's childhood or background, nor did he interview any of Mason's teachers, children's service workers, or his parole officer. J.A. at 1518-22. Mason's family members confirmed that Winkfield never discussed Mason's background or childhood with them. *See* J.A. at 1930 (Mason's father Michael Mason, Sr.); J.A. at 1050-51 (Mason's mother Ruby Mason); J.A. at 1970-71 (Mason's brother James Mason Jr.); J.A. at 1999-2000 (Mason's sister Mioshi); J.A. at 2004-06 (Mason's sister Michelle Floyd); J.A. at 1958-59 (Mason's cousin Minnie Range). In addition, Winkfield testified that he did not even review the box of state records concerning Mason that the prosecution disclosed in discovery. J.A. at 1521. Finally, Winkfield also testified that he was no longer licensed to practice law, having been suspended from the practice of law by the Ohio Supreme Court in 2001 for reasons unrelated to Mason's case. J.A. at 1522-23, 1541-42.

[2] Winkfield testified that he did not participate in the call with the Public Defender's office. J.A. at 1522.

state court's application of *Strickland* as "objectively unreasonable" because "the [state] court did not conduct an assessment of whether the decision to cease all investigation upon obtaining the [state] records actually demonstrated reasonable professional judgment." *Id.* at 527. The Court concluded that "[i]n light of what the [state] records actually revealed, however, counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28. In discussing the nature of the evidence that later investigation uncovered about Wiggins's bleak childhood, the Court noted that a social worker had prepared "an elaborate social history report . . . containing evidence of the severe physical and sexual abuse [Wiggins] suffered" and that the social worker had relied on state records "*as well as interviews with petitioner and numerous family members*." *Id.* at 516 (emphasis added). Finally, the Court approvingly discussed the federal district court's conclusion that awareness of *some* aspects of Wiggins's background "did not excuse [his counsel] from their duty to make a 'fully informed and deliberate decision' about whether to present a mitigation case" and that, "[i]n fact . . . *their knowledge triggered an obligation to look further*." *Id.* at 519 (quoting *Wiggins v. Corcoran*, 164 F. Supp. 2d 538, 559 (D. Md. 2001)) (emphasis added).

The Supreme Court's decision in *Rompilla* offers a similar example regarding the obligation of counsel to conduct an investigation into "*all reasonably available* mitigating evidence" that includes efforts to gain information from *both* state records *and* family members. *Id.* at 524 (quotation omitted). In *Rompilla*, the Court noted that Rompilla's counsel did *some* investigation, which "includ[ed] interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase." *Rompilla*, 545 U.S. at 381. The Court even observed that "Rompilla's own contributions to any mitigation case were minimal," that Rompilla at times seemed to "send[] counsel off on false leads," and that "counsel spoke to the relatives in a 'detailed manner,' attempting to unearth mitigating information." *Id.* (quotation omitted).

Although Rompilla's counsel certainly conducted some investigation into his background, the Court held that Rompilla's counsel were deficient because they failed to consult available public records relating to Rompilla's prior convictions. *Id.* at 382-90. In particular, the Court faulted Rompilla's counsel for failing to review records relating to a conviction for rape and assault given the prosecutor's announced plan to use that conviction as a central part of the state's attempt to prove an aggravating factor. *Id.* at 383-84, 388-89. The Court reasoned that "[i]t flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking." *Id.* at 389. The Court further stated that "[i]f the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up," *id.* at 390, and the Court concluded that "[f]urther effort [to research those leads] would presumably have unearthed much of the material postconviction counsel found, *including testimony from several members of Rompilla's family, whom trial counsel did not interview*," *id.* at 391 (emphasis added).

We now turn to assessing Coulter's investigation prior to June 22 of Mason's childhood and background. In our previous opinion remanding this case to the district court for an evidentiary hearing, we stated that "[w]e find inexplicable the *apparent* failure of trial counsel to investigate mitigating evidence in this case." *Mason I*, 320 F.3d at 623 n.13 (emphasis added). We also observed that "trial counsel's preparation for sentencing *appears* to have been limited to reviewing the documents that the prosecution disclosed to them and deposing Dr. Spare, who tried 'to determine mitigation' and 'to attempt to determine the likelihood of [Mason] being a repeat violent offender and/or his potential for rehabilitation.'" *Id.* at 626 (emphasis added) (quotation omitted); *see also id. at* 623 (stating that "trial counsel does not *appear* to have made any independent effort to investigate the particulars of Mason's history, character, or background") (emphasis added). Finally, we stated that "[t]he *alleged* failure of defense counsel to prepare Mason's family members

for their testimony at sentencing further demonstrates that counsel conducted an inadequate investigation of mitigating evidence." *Id.* at 623-24 (emphasis added).

The evidentiary hearing confirmed what previously was only "apparent" or "alleged": that Coulter relied almost exclusively on the records provided by the state and inexplicably failed to conduct his own independent investigation and interview members of Mason's family regarding the circumstances of his childhood and background. Coulter confirmed that he *never* conducted any in-depth interviews with *any* of Mason's relatives. J.A. at 1674-77; J.A. at 1728 ("There was no extensive interviews."). Although Coulter did contact some of Mason's family members, *see* J.A. at 1680 (stating he talked to various relatives "very briefly"), the crucial point is that the evidentiary hearing demonstrated that Coulter's "very brief[]" contacts with certain Mason family members occurred *after* June 22, the point at which Coulter decided not to include any information about Mason's background or childhood in the mitigation presentation.

Coulter kept detailed, hand-written notes of the time that he spent working on Mason's case, *see* J.A. at 1298-1342, and Coulter's extensive testimony at the evidentiary hearing demonstrates that prior to selecting his mitigation strategy on June 22 Coulter did *not* interview members of Mason's family. According to Coulter's records and his testimony, his limited investigation essentially consisted of the following activities, discussed in chronological order from Coulter's appointment on October 28, 1993. J.A. at 1266.

First, from October 1993 until early May 1994, Coulter's records and his testimony demonstrate that he primarily devoted his time to seeking (and failing to obtain) mitigation assistance from the Ohio Public Defender's Officer and seeking (and failing to obtain) funding from the trial court to hire an independent mitigation investigator. J.A. at 1549-1575 (testimony interpreting time records from October 1993 to May 5, 1994); J.A. at 1298-1307 (time sheets for this period); Pet. Br. at 27-30.

Second, in May to June 1994, Coulter spent time on efforts to obtain a brief psychiatric examination of Mason. In early May, Coulter filed a motion seeking funds to pay for the services of Dr. Joseph T. Spare ("Dr. Spare"), a local psychiatrist. J.A. at 1576-77. On May 9, the trial court approved this request but limited the cost to $600, and Coulter's notes from the hearing on the motion stated that the purpose of the examination was "to find out whether [Mason] is a serial killer or someone not to re-offend and kill again." J.A. at 1368-69; J.A. at 1577-79 (testimony regarding notes). After Dr. Spare examined Mason, he prepared a five-page psychiatric report. *Mason I*, 320 F.3d at 620-22. Dr. Spare based his examination and report solely on interviewing Mason himself and limited his evaluation solely to determining Mason's potential for rehabilitation and the likelihood of future dangerousness; Dr. Spare did not cover Mason's background or childhood in any great detail. J.A. at 1637. Coulter testified that the purpose of Dr. Spare's examination of Mason was "to see whether [Mason] had any severe mental defects, whether he was a repeated serial killer," that "[i]t was not for [Dr. Spare] to go out and interview a bunch of witnesses," and that Dr. Spare "wasn't to review a bunch of records in that regard." J.A. at 1637.[3] Coulter's preparation for the deposition included two hours on May 19 dedicated to reviewing and copying certain state records to give to Dr. Spare, J.A. at 1318, as well as 1.75 hours devoted to preparing for and conducting the deposition on June 7. J.A. at 1595, 1329. June 7 was during the guilt phase of

---

[3] Why Coulter decided to focus Dr. Spare's investigation on the chances of Mason being a repeat offender is somewhat puzzling, given that, according to an expert who testified at the evidentiary hearing, "[u]nder Ohio law in 1993, 1994 and still today, Ohio has no aggravating circumstance of future dangerousness. I guess by—the flip side of that be that it is certainly not a statutory mitigating factor." J.A. at 1774-75; *Mason II*, 396 F. Supp. 2d at 847 (summarizing this testimony). That Coulter channeled one of his few actual investigatory activities toward an attempt to establish the irrelevant—and, indeed, potentially rebuttal-enabling—proposition that Mason was unlikely to be a repeat offender only further illustrates the deficient nature of Coulter's performance.

Mason's trial, and the deposition took place after trial had ended for the day. J.A. at 1329 (time sheet for June 7 reflecting six hours spent in court at trial).

After the conference with the Ohio Public Defender's Office on June 22, Mason's counsel ultimately decided to forego presenting Dr. Spare's deposition testimony because of fears that doing so would open the door to damaging rebuttal evidence that the prosecutor intended to present relating to Mason's history of violent conduct, allegedly including rape, brandishing a gun, resisting arrest, and burglary. *Mason I*, 320 F.3d at 624-25. We will analyze this issue in greater detail below, in our discussion of prejudice.

Third, Coulter spent five hours on May 15, 1994, reviewing the voluminous records pertaining to Mason that the state provided. J.A. at 1581-86, 1315. These records included documents pertaining to Mason's criminal history, his involvement with Children's Services, drug treatment programs, and some educational records. J.A. at 1585. The district court summarized Coulter's testimony as showing that "[f]rom viewing these documents, Coulter learned that [Mason] was born into a drug-dependent family, that the family had in the past and currently was dealing drugs, and that both parents previously had been incarcerated for drug trafficking." *Mason II*, 396 F. Supp. 2d at 844. The records included a psychological evaluation performed when Mason was thirteen years old that stated Mason "has been exposed to quite a lot of violence" and that he "comes from a family which has had many problems over the years." J.A. at 2193-94. Also included was police report from August 1977, when Mason was thirteen years old. J.A. at 2186. The report stated that Mason had several injuries—including a large swelling near his left eye, cuts around his nose, and scars on his back and arms—that Mason claimed resulted from being beaten by his father. *Id.*

Fourth and finally, throughout the period from October 1993 to June 1994, Coulter met at the jail with Mason and Mason's wife several times. Although some of these visits lasted several hours, Coulter testified that generally their discussions were "not extensively[] about the mitigation part of the case." J.A. at 1593. Nonetheless, Coulter testified that he had become aware of many basic facts regarding Mason's background and childhood. At the evidentiary hearing, Coulter referred to notes he had taken pertaining to "some personal recollections" of Mason, such as that he "said when his dad went to prison [] his mom whipped him and his brothers were tied. His father tied him up too and whipped him . . . His dad would beat his mom and stabbed." J.A. at 1672.

Almost entirely absent from Coulter's activities is any mention of interviewing potential witnesses, *particularly family members*, regarding mitigation evidence. The only interviews known to have been conducted with any person other than Mason himself prior to the strategic decision on June 22 appear to be the following: (1) a .1 hour or six-minute call to Mike Ring from Children's Services on May 17, and a .3 hour or eighteen-minute conversation with Mike Ring on May 24, J.A. at 1586, 1589, 1316, 1321; (2) a .6 hour or thirty-six-minute meeting on May 18 with Lowell Titus, who was a probation officer for Mason and his father, J.A. at 1559-60, 1317; Resp. Br. at 38, and who told Coulter that he knew Mason grew up in a "drug environment," J.A. at 1659.

Coulter's records and testimony did demonstrate that he talked very briefly to *some*, but not all, of Mason's family members, but the only conversations with family members for which Coulter's notes establish a known date took place *after* June 22. Thus, what little information Coulter learned from these brief conversations also could not have supported his strategic decision to pursue a mitigation strategy limited to residual doubt and appeals for mercy. Coulter testified that his notes showed that on June 26, the day before the mitigation hearing, he spent .3 hours, or eighteen minutes, talking on the telephone to Michelle Floyd, Mason's sister, Ruby Mason, Mason's mother, and two jailers who testified at the mitigation hearing that Mason had not caused any trouble while he had been incarcerated. J.A. at 1612, 1334.

Evidence presented at the hearing also indicated that Coulter *never* contacted several of Mason's siblings and other close relatives. Mason's sister Mioshi Mason testified that she was not interviewed by Mason's attorneys, but that she would have been willing to testify about conditions in the Mason home, J.A. at 1999-2000, and Coulter confirmed that he had not conducted an in-depth interview with her, or with Mason's sister Nyota Mason, or with Mason's brothers Alex and Dimitri Mason. J.A. at 1674.

Coulter also testified at the evidentiary hearing about two pages of notes taken during his brief interviews with Mason's father, James Mason, Sr., and Mason's brother, James Mason, Jr., but Coulter could not recall when those interviews took place nor did he identify an entry on his time sheets corresponding to these interviews. J.A. at 1450 (notes of conversation with James Mason, Jr.), J.A. at 1686-89 (testimony regarding conversation with James Mason, Jr.), J.A. at 1654-55 ("I can't recall exactly" when the interview with James Mason, Jr., occurred); J.A. at 1451 (four lines of notes from conversation with James Mason, Sr.); J.A. at 1683-85 (testimony regarding conversation with James Mason, Sr.), J.A. at 1656 (stating that Coulter had "no independent recollection" of the conversation with James Mason, Sr., or when it occurred). Coulter recalled that James Mason, Jr., worked as a guard at the Marion Correctional Institution, that James told him there "was no abuse" in the household although there "was spanking" and that there were drug problems in the Mason home. J.A. at 1687-88. Coulter testified that his notes of his conversation with James Mason, Sr., Mason's father, indicated that James Mason, Sr., was never found guilty of the alleged assault against Mason described in the August 1977 police report, and that Mason's father "[s]ays never abused kid, did whip them." J.A. 1683-84.

Even if these interviews took place prior to June 22, they would not have rendered Coulter's investigation into Mason's background reasonable. Indeed, what Coulter appears to have learned from these interviews simply underscores the inadequacy of his investigation. Mason's brother confirmed to Coulter that there was a "[d]rug problem at home," J.A. at 1688, but Coulter's notes reflect that both James Mason, Jr., and James Mason, Sr., told Coulter that there "was no abuse" in the home, although admitting that some degree of physical discipline was used, including "spanking" and "whipping." Those statements appear to contradict the ample documentary evidence referred to above, such as the 1977 childhood psychological evaluation stating that Mason "has been exposed to quite a lot of violence" and that he "comes from a family which has had many problems over the years." J.A. at 2193-94. Likewise, the district court noted that the documentary evidence available to Coulter showed that Mason was "born into a drug-dependent family, that the family had in the past and currently was dealing drugs, and that both parents previously had been incarcerated for drug trafficking." *Mason II*, 396 F. Supp. 2d at 844.

Coulter's failure to continue his investigation and interview Mason's mother and remaining siblings about any abuse and drug activities is inexcusable given this apparent contrast between the facts contained in the documentary evidence and what he apparently learned from Mason's father and brother. The documents available to Coulter indicated that drugs and violence were a large part of Mason's childhood, but his interview notes reflect that Mason's father and brother denied abuse, although they acknowledged physical discipline such as spanking and whipping. Coulter never followed up and never conducted further interviews with other family members to determine which account was accurate, and that failure was deficient performance. *See Wiggins*, 539 U.S. at 519 (stating that some knowledge may "trigger[] an obligation to look further").

Finally, Coulter's interviews with Mason's father and brother were both brief. J.A. at 1728 (stating that "[t]here was no extensive interviews" with any of Mason's family members); J.A. at 1656 (four lines of notes and "no independent recollection" of interview with James Mason, Sr.). *If* those interviews occurred before June 22, Coulter apparently concluded that their cursory accounts of life in the Mason home and Mason's childhood, which were at odds with the documentary evidence, provided him with a sufficient understanding of Mason's background to make a

reasonable decision regarding mitigation strategy. In particular, he apparently concluded that those extremely brief interviews supported forgoing further investigation and the possible presentation of a mitigation defense based on pervasive violence and drug abuse in Mason's home.

In sum, the evidentiary hearing demonstrated that, although state records contained information suggesting that Mason's childhood was marked by violence and pervasive drug use, Coulter's investigative efforts to learn any further details about Mason's background were woefully inadequate. His efforts consisted of no more than reviewing documents provided by the state, arranging for a psychiatric evaluation limited to predicting Mason's future dangerousness, talking to Mason himself, and very briefly talking to a small subset of Mason's family members. Under the Supreme Court's governing case law regarding counsel's obligation to undertake a reasonable investigation to support strategic decisions about the presentation of mitigation evidence, we have no doubt that the performance of Mason's counsel was deficient.

## 2. Whether the Deficient Performance of Mason's Counsel Caused Prejudice

To prevail on his claim of ineffective assistance of counsel, Mason must also show that his counsel's deficient performance caused him prejudice. We agree with Mason that his counsel's deficient performance caused him prejudice.

As described above, Mason need only have persuaded one juror not to impose the death penalty, and Mason's jury initially reported a deadlock regarding his sentence. Even a slightly more compelling case for mitigation thus might have altered the outcome of the sentencing phase of Mason's trial. At the evidentiary hearing, Mason presented substantial evidence detailing the abusive and unhealthy conditions of his childhood. The district court summarized this evidence as showing that Mason's father ran a prostitution ring for three years, that he operated a home-based drug business with ten employees selling drugs for him, that both of Mason's parents were daily drug users as well as traffickers, that Mason's mother shot his father because of his involvement with prostitution, and that Mason's parents regularly abused Mason and isolated all of their children from anyone not associated with the parents' drug dealing activities. *Mason II*, 396 F. Supp. 2d at 847-49. Further, the evidence demonstrated that Mason had experimented with drugs as an eight-year-old, that Mason's father took him along on trips to purchase and sell drugs while Mason was in the sixth and seventh grades, and that Mason had a borderline personality disorder largely as a result of his dysfunctional home environment. *Id.* at 847-49. Mason thus "has the kind of troubled history that [the Supreme Court] ha[s] declared relevant to assessing a defendant's moral culpability," and we therefore hold that "had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wiggins*, 539 U.S. at 534, 536.

The district court reached a contrary conclusion because it reasoned that any effort by Mason's counsel to introduce evidence about his childhood and background would necessarily have led to the trial court's admission of damaging rebuttal evidence about an alleged rape that Mason had committed. *See Mason II*, 396 F. Supp. 2d at 855. The district court stated, without citation to the record, that "the trial court specifically held that even if counsel presented only the mitigating evidence pertaining to [Mason's] family and social history, [Ohio evidence law] would allow the prosecution to present its rebuttal evidence." *Id.* The district court therefore concluded that Mason could not establish prejudice because although "depicting his family background undoubtedly would have evoked sympathy from the jury, the prosecution's rebuttal evidence . . . could have turned the jury against him." *Id.*

Both the record and our holding in *Mason I* contradict the district court's understanding regarding the possible admission of the prosecution's rebuttal evidence. The district court provided no citation for its claim that the trial court ruled that the prosecution could present rebuttal evidence

pertaining to Mason's criminal history even if Mason's mitigation presentation involved only his family history, and this view is simply wrong.

As we stated in *Mason I*, testimony that purely concerned Mason's troubled childhood would "not give the prosecutor the same opportunity for rebuttal that evidence about good character or rehabilitation potential could have." *Mason I*, 320 F.3d at 622 n.10. Indeed, in *State v. DePew*, 528 N.E.2d 542, 555 (Ohio 1988), the Ohio Supreme Court held that if "a mitigation witness called by the defense *falsely or incompletely testifies on the extent of the defendant's criminal record*, the prosecutor should be permitted to rebut." (emphasis added). The Ohio Supreme Court emphasized in *DePew* that "[t]his right is limited, however, to those instances where the defense offers a *specific assertion*, by a mitigation witness or by the defendant, *that misrepresents the defendant's prior criminal history*." *Id.* (emphasis added); *see also id.* at 545 (identical language in Syllabus ¶ 3)[4]; *see also Mason I*, 320 F.3d at 626-27 (quoting nearly identical language from *State v. Henness*, 679 N.E.2d 686, 698 (1997)).[5]

The record also demonstrates that the trial court specifically addressed the admissibility of the prosecutor's rebuttal evidence in the context of whether Mason's counsel planned to introduce *Dr. Spare's deposition testimony*. *See* J.A. at 681-86. The record does not indicate how the trial court would have treated the prosecutor's rebuttal evidence if Mason's counsel presented only evidence detailing Mason's troubled childhood, most likely because Mason's counsel never investigated Mason's childhood nor planned to present such evidence.

---

[4] In the Ohio judicial system until 2002, it was "well-established that the syllabus of an opinion issued by [the Ohio Supreme Court] states the law of the case . . . [and a]s such, all lower courts in this state are bound to adhere the principles set forth therein." *Smith v. Klem*, 450 N.E.2d 1171, 1173 (Ohio 1983); *see also Cassidy v. Glossip*, 231 N.E.2d 64, 65 (Ohio 1967) (Syllabus ¶ 6: "The syllabus of a decision of the Supreme Court of Ohio states the law of the case"). Thus, in 1994 at the time of Mason's trial, the third paragraph of the syllabus in *DePew* clearly stated the binding rule that only specific assertions misrepresenting a defendant's *prior criminal history* permitted the prosecutor to offer rebuttal evidence.

Effective May 1, 2002, the Ohio Supreme Court amended the relevant rule to state that "[t]he law stated in a Supreme Court opinion is contained within its syllabus (if one is provided), *and* its text, including footnotes." S. Ct. R. Rep. Op. 1(B)(1) (emphasis added).

[5] The district court and the Warden both attack our opinion in *Mason I* by noting that the Ohio Supreme Court issued its opinion in *Henness* three years after Mason's trial. *See Mason II*, 396 F. Supp. 2d at 856 n.6; Resp. Br. at 59-60. The district court contended that in *Henness* the Ohio Supreme Court "iterated that the *DePew* holding only allows the State to introduce rebuttal evidence if the defendant misstates his or her criminal history." *Mason II*, 396 F. Supp. 2d at 856 n.6. The district court concluded that "[c]ounsel cannot be held ineffective for failing to anticipate the *Henness* decision's firm resolution of this issue." But as we point out above, *Henness* repeated *DePew*'s holding using almost identical language, and we disagree that our reading of *DePew* and *Henness* punishes Mason's counsel for "failing to anticipate" anything. Indeed, the district court itself described testimony presented at the evidentiary hearing that under "Ohio law as of 1994 and now, the defense does *not* open the door to rebuttal evidence unless it presents evidence that is either inaccurate or misstates some point of evidence." *Mason II*, 396 F. Supp. 2d at 847 (emphasis added).

In addition, in *State v. Durr*, 568 N.E.2d 674, 683-84 (Ohio 1991), the Ohio Supreme Court applied *DePew* in just this manner three years before Mason's trial. At the sentencing phase in that case, the prosecutor's statement included the following remark: "'The defendant's lack of prior criminal convictions. Will he take the stand with a aworn [*sic*] statement? Unfortunately, I don't know how that applies to this case.'" *Id.* at 683 (alteration in original). Noting that "[t]he record in this case is devoid of any reference by appellant or any mitigation witness that the appellant was free of criminal convictions," the Ohio Supreme Court explained that the prosecutor's "statement does violate the *DePew* standard as it improperly comments on both the appellant's unsworn statement and the appellant's prior convictions." *Id.* at 684.

Finally, as explained in text above, the record does not indicate that the trial court expressed any opinion regarding whether a mitigation presentation relying purely on family background would permit the state to introduce rebuttal evidence of Mason's prior criminal acts because Mason's counsel never advanced the possibility of such a presentation, as defense counsel instead focused only on presenting Dr. Spare's opinion concerning whether Mason was likely to be a repeat offender.

On June 27, 1994, the morning of the mitigation hearing, the trial court heard argument regarding the status of Dr. Spare's deposition and the nature of the defense's mitigation strategy. J.A. at 677-86. The prosecutor described Dr. Spare's testimony as concluding that Mason "was not likely to be a repeat violent offender, and he based that on his opinion that [Mason] had not engaged in violent conduct in the past." J.A. at 682. The prosecutor noted that Mason's counsel no longer planned to present Dr. Spare's testimony and observed that defense counsel would present testimony regarding Mason's good conduct in jail and from family members appealing for mercy, and also would argue against the death penalty based on residual doubt. J.A. at 683. The prosecutor stated his conclusion that if Mason's counsel did not intend to present "Dr. Spare's examination, [then] the State would not be in a position to rebut[] that evidence." *Id.* Mason's counsel then made a motion in limine to prevent the prosecutor from admitting the rebuttal evidence in light of the defense's intention not to present Dr. Spare's testimony but rather to pursue the limited strategy outlined above. J.A. at 685-86. The trial court stated that "[i]f you don't put on the record anymore than what the Prosecutor indicated . . . then of course that will be granted." J.A. at 686. This entire discussion focused on Dr. Spare's testimony, which, as the prosecutor indicated, involved a false statement about Mason's criminal history and thus *would* have permitted the prosecution, under *DePew*, to introduce its rebuttal evidence regarding Mason's criminal history.

Coulter's testimony at the evidentiary hearing similarly depicted the trial court's evidentiary ruling as tethered to the consequences of introducing Dr. Spare's deposition testimony regarding Mason's criminal history and likelihood of being a repeat offender. In describing his conversation with the Public Defender's office on June 22, Coulter stated that the conversation was focused on addressing the following dilemma. Coulter explained that "[i]f we introduced [Mason's] family history and/or Dr. Spare's testimony about his ability to be rehabilitated or general characteristics as being nonviolent," then the prosecutor "was willing to bring in several different things . . . a parole violation case where [Mason] supposedly brandished a firearm . . . bringing information of [Mason's] past convictions, burglarly and trafficking and drugs . . . [and] a young girl approximately 18 years of age who had alleged that Mr. Mason had raped her, I believe, back in October of '92." J.A. at 1600-01. Coulter summarized that "the prosecutor's position was, okay, if you go with family history and/or, you know, Dr. Spare's testimony, nonviolence or his characteristics or his ability to be rehabilitated we're going to bring this evidence in." J.A. at 1601.

Later questioning clarified that the possible presentation of Dr. Spare's testimony was seen as the potential trigger that would permit the prosecutor to present rebuttal evidence. Coulter read the conclusion of Dr. Spare's report, which stated a conclusion that "[b]ased on the information available, including Mr. Mason's history, psychiatric examination, and psychological testing, [] Mr. Mason is not likely to be repeat or violent offender nor does he have an unusual propensity to act out violently in the future." J.A. at 1730. The following exchange then occurred:

| | |
|---|---|
| [Mr. Stebbins]: | Now, when you had the discussions with Judge Wiedemann and Prosecutor Slagle about rebuttal evidence coming in, Danielle Miller [the alleged rape victim]— |
| [Coulter]: | Yes, sir. |
| [Mr. Stebbins]: | —Jones, brandishing a firearm, the burglary, all of those discussions, was this going to come in in rebuttal to Dr. Spare's conclusions that [Mason] would not be a, not likely to be a violent—repeat violent offender? |
| [Coulter]: | Yes, because we were bringing up his criminal history, his history was coming up through his—from Dr. Spare's testimony. |
| [Mr. Stebbins]: | So that comes in to rebut what Dr. Spare is going to conclude? |
| [Coulter]: | That was part of the impression we got from the judge. |
| [Mr. Stebbins]: | But Dr. Spare was going to testify, if he testified, that [Mason] would not be a repeat violent offender? |

[Coulter]: Correct.
[Mr. Stebbins]: And the rebuttal would come in to rebut that?
[Coulter]: Yes, because it was part of his history.

J.A. at 1731-32. This discussion makes clear that the admissibility of the prosecutor's rebuttal evidence hinged on whether the defense would make use of Dr. Spare's deposition testimony that misstated Mason's *criminal* history and that opined on the likelihood of Mason being a repeat violent offender. Whether the trial court would have admitted the prosecutor's rebuttal evidence in response to a defense strategy based solely on the circumstances of Mason's troubled childhood remains a hypothetical question because Coulter never planned to present such a defense.

In sum, we hold that Mason has demonstrated a reasonable probability that, had his counsel presented the mitigating evidence introduced at the evidentiary hearing, at least one juror might have been persuaded not to impose the death penalty.

### 3. Whether the Ohio Supreme Court Unreasonably Applied Clearly Established Federal Law in Adjudicating Mason's Ineffective Assistance of Counsel Claim

Although we have concluded that Mason has satisfied the standards required to prevail on a claim of ineffective assistance of counsel, to grant Mason's petition for a writ of habeas corpus requires holding that the Ohio Supreme Court unreasonably applied clearly established federal law in denying his claim. 28 U.S.C. § 2254(d).

In rejecting Mason's claim of ineffective assistance of counsel at the sentencing phase, the Ohio Supreme Court's opinion contained the following analysis, quoted in full:

> *Penalty Phase.* Mason argues that his counsel failed to investigate and present a life history of Mason and his psychological background so that he would not receive the death penalty. Mason also complains about the paucity of mitigation evidence presented in defense.
>
> The record, however, suggests that defense counsel had voluminous records about his history and background. Counsel prepared twelve exhibits documenting aspects of Mason's childhood, such as reports that he was beaten by his father and released by his parents to juvenile authorities, as well as early psychological evaluations, but did not present them to the jury. Mason argues that these exhibits show that a cogent, persuasive mitigation case could have been built revealing Mason's childhood exposure to violence, his dysfunctional family, and his early emotional and psychological problems.
>
> But the records also show prior involvements with the criminal and juvenile justice systems, and other unfavorable matters. Mason could not have presented evidence as to his good character and rehabilitation potential without risking the introduction of negative evidence by the state in rebuttal.
>
> Similarly it was not an unreasonable strategic decision to refrain from presenting the video deposition of psychiatrist Dr. Spare in order to avoid rebuttal by evidence of Mason's behavioral problems, character deficiencies, and poor potential for rehabilitation. We will not second-guess the strategic decisions counsel made at trial even though appellate counsel now argue that they would have defended differently. *State v. Post* (1987), 32 Ohio St.3d 380, 388, 513 N.E.2d 754, 762.
>
> Nor has Mason shown prejudice, the second *Strickland* requirement, namely "a reasonable probability" that different tactical choices at the penalty phase would have made a difference in the result. *See State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

*State v. Mason*, 694 N.E.2d 932, 956 (Ohio1998).

The Ohio Supreme Court unreasonably applied the *Strickland* standard in rejecting Mason's claim because the Ohio Supreme Court ignored the principle established in *Strickland* that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91; *see also Williams*, 529 U.S. at 396 (finding deficient performance because "trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"). Although the Ohio Supreme Court noted that Mason's counsel "had voluminous records about his history and background" and that his counsel "prepared twelve exhibits documenting aspects of Mason's childhood" for use in deposing Dr. Spare, *State v. Mason*, 694 N.E.2d at 956, the opinion failed to consider whether Mason's counsel conducted any interviews with Mason's family members or performed any investigation beyond examining the documents that the state provided to them and talking to Mason. The Ohio Supreme Court simply asserted that Mason's counsel had made a strategic decision regarding mitigation strategy, but that court failed to assess whether a thorough and reasonable investigation supported counsel's strategic decision. This constitutes an unreasonable application of *Strickland*. *See Wiggins*, 539 U.S. at 527 (observing that "the Maryland Court of Appeals appears to have assumed that because counsel had *some* information with respect to petitioner's background—the information in the [state] records—they were in a position to make a tactical choice not to present a mitigation defense," and characterizing the state court's application of *Strickland* as "objectively unreasonable" because "the [state] court did not conduct an assessment of whether the decision to cease all investigation upon obtaining the [state] records actually demonstrated reasonable professional judgment").

The Ohio Supreme Court also rejected Mason's claim of ineffective assistance of counsel on the ground that Mason had failed to show prejudice, but this analysis too is flawed and objectively unreasonable. The Ohio Supreme Court noted Mason's argument that a "cogent, persuasive mitigation case could have been built revealing Mason's *childhood exposure to violence, his dysfunctional family, and his early emotional and psychological problems*." *State v. Mason*, 694 N.E.2d at 956 (emphasis added). Despite this acknowledgment of the nature of the mitigation case that Mason argued his counsel *should* have presented, the very next sentence in the Ohio Supreme Court's opinion stated that "[b]ut the [state] records show prior involvements with the criminal and juvenile justice systems, and other unfavorable matters" and the court then observed that "Mason could not have presented *evidence as to his good character and rehabilitation potential* without risking the introduction of negative evidence by the state in rebuttal." *Id.* (emphasis added). Mentioning the possibility that presenting evidence "as to his good character and rehabilitation potential" would risk rebuttal evidence makes absolutely no sense given that the opinion *had just described* Mason's argument that his counsel should have presented a mitigation case focusing on his childhood, dysfunctional family, and his emotional psychological problems, *not* his good character or rehabilitation potential. It was objectively unreasonable to hold that Mason failed to show prejudice by invoking the spectre of rebuttal evidence responding to a mitigation strategy that Mason was not advocating.

## III. CONCLUSION

For the reasons discussed above, we **REVERSE** the judgment of the district court, **GRANT** Mason a conditional writ of habeas corpus that will result in the vacation of his death sentence unless the state of Ohio commences a new penalty-phase trial against him within 180 days from the date that the judgment in this matter becomes final, and **REMAND** the case for further proceedings consistent with this opinion.

------------------------

**DISSENT**

------------------------

BOGGS, Chief Judge, dissenting. After we remanded to give the condemned exactly what he asked for, an evidentiary hearing before a federal district judge, the learned trial judge carefully reviewed the evidence presented and correctly applied the relevant federal law under AEDPA and *Strickland v. Washington.* Today our court continues a distressing trend of finely parsing defense counsel judgments, based on the most charitable (to the condemned) or malevolent (to the defense counsel) view of facts and holds that counsel was *constitutionally* ineffective. I emphasize constitutionally because in a common-sense way, counsel was of course ineffective – his client was sentenced to death. However, that is not the standard that we are to apply, and I therefore dissent.

I. Ineffectiveness

"[T]he crux of [Mason's] challenge is that his counsel provided ineffective assistance because they failed to investigate his background and conduct any *in-depth* interviews of his family members *prior* to the decision on June 22, 1994, to limit the mitigation presentation to appeals for mercy and claims of residual doubt." Op. at 6 (emphasis added). The emphasized portions of the above quote illustrate the two principal bases on which today's opinion rests: the *adequacy* and the *timing* of the interviews defense counsel Ted Coulter conducted with Mason's family members. Coulter's decision not to present any evidence related to Mason's family background at the sentencing phase was a strategic one, but today's opinion argues that the investigation supporting this decision was itself unreasonable.

First, with regard to the timing, the opinion places considerable emphasis on the fact that Coulter did not *verifiably* conduct any interviews with Mason's family members *prior* to June 22, 1994, the date on which Coulter, in consultation with the Ohio Public Defender's Office, made the strategic decision not to present any evidence related to Mason's family background at the sentencing phase (for fear that it would open the door to damaging rebuttal evidence). *See* Op. at 10-11. It states "Coulter's records and testimony did demonstrate that he talked very briefly to *some*, but not all, of Mason's family members, but the only conversations with family members for which Coulter's notes establish a known date took place *after* June 22. Thus, what little information Coulter learned from these brief conversations also could not have supported his strategic decision . . . ." *Ibid.* While Coulter's contemporaneous notes do not establish a date for most of the interviews he conducted with Mason's family members,[1] it is incorrect to state categorically that "Coulter's extensive testimony at the evidentiary hearing demonstrates that prior to selecting his mitigation strategy on June 22 Coulter did *not* interview members of Mason's family." Op. at 9. Note Coulter's testimony:

> Q.     Now, your decision then to forego the presentation of the family history and to forego Dr. Spare's deposition —
>
> A.     Yes, sir.

------------------------

[1] Coulter interviewed Michelle Floyd (Maurice Mason's sister), J.A. 1657, 1680; James Mason, Jr. (his brother), J.A. 1654, 1680; Ruby Mason (his mother), J.A. 1680; James Mason, Sr. (his father), J.A. 1656, 1680; and Wilma Jones (his aunt), J.A. 1681. Coulter must also have spoken at some point with Tara Dyer (Mason's cousin), because he called her as a witness during the sentencing phase. J.A. 724. Coulter's notes indicate that he conducted phone interviews with Michelle Floyd and Ruby Mason on June 26 (though it is not clear that this was the only time he ever spoke with them). J.A. 1334. There is no indication when the other interviews may have taken place. Coulter could not remember whether he had ever interviewed four other of Maurice Mason's siblings, and there was no evidence to suggest that he had.

Q.      — at trial was based on the rebuttal that was going to come in, correct?

A.      Yes, sir.

Q.      And it was based on, in your opinion, the rebuttal being stronger than any mitigation that you were to get out of this, correct?

A.      Yes.

Q.      Now, this was based on what you have stated is brief interviews with Mason's family, is that correct?

A.      Correct.

Q.      And that's the information that you based your decision on correct?

A.      Yes, sir.

J.A. 1736. Coulter unequivocally testified that his strategic decision *was* based on the interviews he conducted with Mason's family, which leads one to believe that he must have conducted at least *some* of the interviews before making that decision. Nevertheless, Coulter could not remember — testifying ten years later — the exact dates of those interviews, and he would commit only to having conducted them prior to the mitigation hearing itself. J.A. 1655. Thus, the best that can be said for the opinion is that Coulter's testimony *fails to establish* whether (or which of) the interviews were conducted before June 22. But Mason bears the burden of establishing the inadequacy of Coulter's investigation — Coulter is not responsible for proving the opposite, ten years after the fact. Moreover, there is no dispute that Coulter addressed mitigation matters to some extent with Maurice Mason himself during jail visits that indisputably occurred long before June 22. Op. at 10; J.A. 1593-94. He also spoke with Mason's wife, Terry Mason, on numerous occasions long before June 22, and she was often present during Coulter's jail visits with her husband, some of which addressed mitigation matters. J.A. 1303-05, 1586, 1588, 1598.

Second, perhaps anticipating this argument, the opinion notes that, even if Coulter had conducted the interviews prior to June 22, his investigation was still inadequate. Op. at 11. It is asserted that the evidence that Coulter's investigation did uncover was too limited to make a reasonable decision regarding strategy, and, in fact, triggered a duty to investigate further. *Ibid.* (citing *Wiggins v. Smith*, 539 U.S. 510, 519 (2003)). The opinion places great weight on Coulter's admissions that the interviews with the family members were not "in-depth" or "extensive." Op. at 9, 12.[2] And it faults him for failing to question the family members about an apparent discrepancy between what Mason's father and older brother said about family life in the Mason household (that there was physical discipline but no abuse) and what was contained in the state documents reviewed by Coulter (detailing significant physical injuries that Mason sustained, allegedly at the hands of his father). Op. at 10-11, 12.

Yet, the record makes clear that Coulter was already aware of virtually all of the details of Mason's background necessary to make a strategic decision whether to pursue a mitigation defense based on family history. That is to say, *the opinion does not point to a single significant piece of*

---

[2] Coulter testified that these interviews were "very brief[]." J.A. 1680. Nevertheless, at least one of the interviews (with Mason's older brother) was long enough for Coulter to compile a page of notes. J.A. 1450. The notes demonstrate that Coulter learned important details regarding Mason's upbringing, including that Mason was the "wild one," that there "was a drug problem in the home," and that Mason was whipped. *Ibid.*

*evidence in the record of which Coulter was unaware due to his failure to investigate further.*[3] Rather, the record establishes that Coulter knew that there was significant domestic violence in the household, including (1) that Mason was physically abused, (2) that his father would beat his mother, (3) that the children would be tied up and whipped, (4) that his father once stabbed his brother, (5) that Mason's father "beat him with sticks while in the backseat of the car," and (6) that Mason ran away from home because his father beat him often. J.A. 1672, 1678-79, 1696-97, 2186. Coulter was similarly aware of the extensive drug abuse in Mason's home, including (1) that Mason's parents had "been selling dope before [he] was born," J.A. 1236, 1672, (2) that they started selling cocaine by the mid-1980s, J.A. 1672, (3) that they had drug-trafficking convictions, J.A. 1679, (4) that Mason started using drugs himself "in the middle elementary grades," J.A. 1179, (5) that he would steal his parents' drugs (for which he would be punished), J.A. 1180-81, 2277, and (6) that Mason "got into cocaine at age 14," J.A. 2240.

Thus, even if Coulter had done everything that the opinion would require of him (*e.g.*, contacting every single family member, or conducting more interviews of "greater depth"), he would have learned *virtually nothing* that he did not already know. This stands in stark contrast to *Wiggins*, in which trial counsel's failure to investigate left a litany of horrific details of Wiggins's childhood undiscovered.[4] Indeed, compared to trial counsel's investigation in *Wiggins* — which was limited to the review of a one-page pre-sentence report and some rudimentary social services documents[5] — Coulter's investigation was extraordinarily thorough: he reviewed Mason's criminal records, juvenile records, Children's Services records, counseling records, and educational records (described by the opinion as "voluminous," op. at 10); he spoke with Mason's probation officer, Lowell Titus, who was also Mason's father's probation officer; he arranged for a psychiatrist, Dr. Joseph Spare, to do an evaluation of Mason's mental health, including some exploration of Mason's

---

[3] To be sure, there are some details that might have emerged from exhaustive further investigation. For example, there is an instance in which Mason witnessed his mother shoot his father (non-fatally). There is also evidence that Mason's father ran a prostitution ring, but, as the district court stated,

> the duty to investigate further is triggered only when the information that trial counsel already reviews warrants further investigation. *Wiggins*, 539 U.S. at 527. Neither defense trial counsel here encountered any information in either their interviews with family members or their review of documents that suggested that the Petitioner's father was involved with prostitution. Thus, counsel could not have reasonably known about it nor were they constitutionally required to discover its existence.

J.A. 405.

[4] These include that Wiggins's mother

> frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner—an incident that led to petitioner's hospitalization. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically, and . . . the father in his second foster home repeatedly molested and raped him. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Wiggins*, 539 U.S. at 516-17 (citations omitted).

[5] Wiggins's defense counsel also arranged for a psychological evaluation, but, unlike Mason's psychiatric evaluation, the evaluation of Wiggins "revealed nothing . . . of [his] life history." *Wiggins*, 539 U.S. at 523.

troubled childhood;[6] he spoke with the deputy sheriffs who encountered Mason in jail; he talked with Mike Ring, a Children's Services worker who was familiar with Mason's case; he interviewed Mason himself and Mason's wife about Mason's background and family life; and he interviewed (however briefly) Mason's father, mother, brother, sister, and aunt.[7]  J.A. 1585-98, 1654-57, 1680-81.

Although one might argue that Coulter's decision to forego a mitigation defense based on family history was a foolish one, it was not the product of a constitutionally deficient investigation. There is nothing that any further investigation would have revealed that would have led Coulter to weigh his options differently and come to a different conclusion.  He possessed all of the essential facts regarding Mason's background necessary to make a reasonable strategic choice.  The opinion basically second-guesses that choice, and in so doing, applies the very hindsight that *Strickland* forbids.

## II.  Prejudice

Because Mason fails to carry his burden of demonstrating that Coulter's investigation was constitutionally inadequate under *Strickland*'s first prong, there is no need to address prejudice.  The opinion is quite clear in holding that counsel was ineffective, not for making the strategic choice to rely on residual doubt at sentencing, but for failing to conduct a sufficiently thorough investigation to support that choice.  Thus, in order for there to be prejudice resulting from this error, it must be because a competent defense attorney, having conducted a more thorough mitigation investigation, would instead have made the *opposite* strategic choice — electing to present a mitigation defense based on Mason's troubled upbringing rather than relying on residual doubt.  But there is absolutely no reason to believe that *any* competent defense counsel would ever have made this choice, no matter the extent of the mitigation investigation, because the trial judge (according to Coulter) would have allowed the prosecution to introduce damning rebuttal evidence, including, *inter alia*, the testimony of an eighteen-year-old woman who had previously been raped by Mason — a crime "eerily similar" to the one for which the jury had just convicted him.  *See Mason v. Mitchell*, 320 F.3d 604, 646 (6th Cir. 2003) (Boggs, J., dissenting in part).

The opinion argues that the trial court was prepared to permit the prosecution's rebuttal evidence if defense counsel sought to admit *Dr. Spare's* deposition testimony, but that it never specifically addressed the potential rebuttal evidence, which remains a "hypothetical question." Op. at 14, 15.  It also argues that the state of evidence law in Ohio as it existed when Mason was tried was that, so long as none of the defense witnesses misrepresented Mason's criminal history or likelihood for future dangerousness, the prosecution would not have been permitted to introduce any rebuttal evidence.  Op. at 13-14.  While the opinion's views on these matters could be thoroughly controverted, I have not done so because, in a correct analysis, they are irrelevant.

Even if the opinion's analyses of Ohio evidence law and *DePew* were correct as a matter of prediction of ultimate resolution by courts of last resort, Coulter's estimation of the trial judge

---

[6] The opinion describes the evaluation as "limited . . . solely to determining Mason's potential for rehabilitation and the likelihood of future dangerousness; Dr. Spare did not cover Mason's background or childhood in any great detail." Op. at 9. Although Coulter did describe the evaluation as "very limited," J.A. 1637, Dr. Spare described it as a "more in-depth evaluation of [Mason's] situation and background, including some personality evaluation," J.A. 1178. However one chooses to characterize it, Dr. Spare clearly did go into some depth on the issues of drug abuse and physical violence in the Mason household. *See* J.A. 1178-83.  As previously noted, Dr. Spare took a "relatively extensive oral history from Mason" that "recounted essentially all of the facts that, according to [the] court, were not discovered by defense counsel." *Mason v. Mitchell*, 320 F.3d 604, 644 (6th Cir. 2003) (Boggs, J., dissenting in part).

[7] Coulter also presumably spoke with Mason's cousin, Tara Dyer.  *See* n.1 *supra*.  The opinion describes this entire group as a "small subset" of Mason's family, op. at 12.

was that he would have permitted the introduction of the rebuttal evidence regardless. To be sure, as I stated before our remand,

> [d]efense counsel . . . could have . . . appealed a district court decision to admit Mason's negative history as rebuttal evidence. Yet we have never held that defense counsel is constitutionally obligated to take such a risk, especially when the trial court's ruling is far from clearly the abuse of discretion that would be required to overturn its evidentiary determination.

*Mason*, 320 F.3d at 645 (Boggs, J., dissenting in part). And it is entirely possible that, had defense counsel pursued a mitigation strategy that relied on extensively describing Mason's character and background, one of the family members might accidentally have commented in some way on Mason's criminal history, which would have opened the door to the disastrous rebuttal evidence even under the court's reading of *DePew*. (In which case, no doubt, Coulter would be accused of ineffectiveness for failing to rely solely on residual doubt.)

It is also notable, and remarkable, that the opinion waves off the likely, or plausible, outcome had the "poor me" defense been presented at trial as merely hypothetical, and never flatly states that there is a reasonable probability, *in that courtroom, at that time*, that petitioner would not have been sentenced to death, in light of the actual likelihood of the devastating rebuttal.

## III. Conclusion

This opinion sets an almost impossibly high bar for defense counsel in capital cases. Defense counsel is now required "to locate and interview the client's family members . . . and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others," *Van Hook v. Anderson*, 535 F.3d 458, 463 (6th Cir. 2008) (quoting the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ¶ 10.7, at 83); he must interview them long enough so that those interviews can be characterized as "extensive" and "in-depth," op. at 9; every conceivable family member must be contacted, no matter that defense counsel has spoken with the defendant, his wife, mother, father, brother, sister, aunt, and cousin (along with several non-family members), op. at 11-12; and he must do all this *even if* he reasonably believes (based on the trial court's rulings and his own reasonable interpretation of state law) that the introduction of any evidence regarding the defendant's family background could open the door to truly disastrous rebuttal evidence by the prosecution. Nothing in *Strickland* or its progeny requires defense counsel to go to such extreme lengths in order to meet the (relatively low) threshold of "reasonably effective assistance."

For these reasons, I respectfully dissent.