NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0110n.06

No. 20-3612

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| ADAM JONES, | ) | **FILED**<br>Mar 09, 2022<br>DEBORAH S. HUNT, Clerk |
| Petitioner-Appellant, | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED<br>STATES DISTRICT COURT FOR<br>THE SOUTHERN DISTRICT OF<br>OHIO |
| TOM SCHWEITZER, Warden, | ) |  |
| Respondent-Appellee. | ) | OPINION |

Before: SUTTON, Chief Judge; BOGGS and NALBANDIAN, Circuit Judges.

NALBANDIAN, J., delivered the opinion of the court in which SUTTON, C.J., joined in full, and BOGGS, J., joined in the result.

NALBANDIAN, Circuit Judge. Stephanie, a young mother, left her four-year-old daughter, Marianne,[1] with her boyfriend, Adam Jones. Less than an hour later, Jones called 911 to report that Marianne had become injured and unresponsive during her nap. First responders rushed Marianne to Cincinnati Children's Hospital. Doctors there removed part of her skull to relieve pressure on her brain and to stop the active bleeding. Under their care, she made a speedy recovery.

Prosecutors charged Jones with child endangerment, and a jury convicted him. In his post-conviction proceedings, Jones argued that his trial counsel's failure to introduce any expert testimony constituted ineffective assistance of counsel. The Ohio courts agreed that Jones' counsel

---

[1] The Ohio courts used a pseudonym to protect the victim's privacy. We continue that practice here.

performed deficiently, but they upheld Jones' conviction because his counsel's failures did not prejudice him. Because we agree with the state courts—and mindful that even if we didn't, we'd owe their conclusion deference—we **AFFIRM**.

**I.**

*Marianne*. Marianne was born with VATER association. VATER is an acronym used to describe a series of abnormalities that often occur together, including "an anus that does not open to the outside of the body" and "a persistent connection between the trachea (the windpipe) and the esophagus (the feeding tube)." *VATER Syndrome/VACTERL Association*, Cincinnati Children's, https://www.cincinnatichildrens.org/health/v/vacterl (last visited Mar. 07, 2022). Many children with VATER association lead normal lives. *See id.*

Before Marianne turned four, she had undergone twenty surgeries, including liver and pancreas transplants. She had no anus or rectum, and her undersized bladder required her to wear a diaper. Her mother, Stephanie, fed Marianne through a feeding tube below Marianne's ribs. The feeding tube also allowed Stephanie to administer Marianne's medications. During the day, when she wasn't receiving food or medicine, Marianne could explore and play freely.

Just over two weeks before Marianne's injuries, she slipped and hit her head on the kitchen floor. She cried briefly but was otherwise fine. During a doctor's appointment later that week, her mother mentioned Marianne's fall to the physician, who examined Marianne without prescribing any treatment. A few days later, Marianne's nose swelled up so much that she couldn't breathe through it. She returned to the hospital and received treatment for an infection. Because Marianne took immunosuppressive medications, infections could become "serious." The hospital discharged Marianne on August 3, 2010.

On August 5, Marianne slept later than normal. Before Stephanie left to run errands, she and Jones tucked Marianne in for a nap. Jones and Stephanie shared a room in their friend's home. Stephanie said Marianne "seemed fine" when she left.

Jones says that he then went downstairs to play video games for about 20 minutes. When he returned to Marianne's room, she was lying on her side on the ground. He testified that "she was doing nothing," sometimes making "a gurgle noise like maybe she was choking on something," and that "[h]er eyes were like rolled into the back of her . . . eye sockets." (R. 7, Ohio Ct. App. Op., PageID 852.) Jones scooped up Marianne and ran to a neighbor's house to call 911. First responders arrived, taking Marianne to a local emergency room by ambulance. After a CAT scan, medical workers sent Marianne to Cincinnati Children's Hospital by aircraft.

The physicians at Cincinnati Children's immediately took Marianne into surgery. They placed her on a ventilator, because she was unable to breath independently, and administered medications to stabilize her heart and lungs. The results of her earlier CAT scan confirmed there was "a large amount of bleeding" and a blood clot on her brain. (*Id.* at PageID 853.) The size of the clot had displaced Marianne's brain, moving it about two centimeters.

Doctors removed part of Marianne's skull to relieve the pressure. She was actively bleeding until the surgeon staunched her wounds. The hospital continued to monitor her swelling, using medication to relieve pressure as needed. A pediatric ophthalmologist examined Marianne the next day. He discovered multiple retinal hemorrhages behind each of the four-year-old's eyes. The retina has seven layers; Marianne had bled through every layer on both sides.

Marianne's surgeon described her recovery as "amazing and dramatic." (*Id.* at PageID 855.) In two days, she had regained consciousness and her ability to breathe independently. A few days after this, her speech returned.

*Ohio Criminal Proceedings.*   Suspicion turned to Jones and after an investigation, prosecutors charged him with one count of endangering children.   At trial, the prosecution presented three expert witnesses from Cincinnati Children's.   Dr. Charles Stevenson was the pediatric neurosurgeon who treated Marianne upon her admission.   Dr. Kathi Makoroff was a pediatrician who specializes in child abuse and who consulted on Marianne's case.   Dr. Gray was a pediatric ophthalmologist who examined Marianne's eyes.

Dr. Stevenson sees over one thousand patients every year.   He testified that, after removing the left side of Marianne's skull during surgery, the "vast majority" of the blood inside Marianne's skull was "so fresh that it had not yet had time to clot."   (R. 6-2, Trial Tr., PageID 354-57.) "[A]ctive spurting" continued adding to the pooled blood, until his team stopped the bleeding.   (*Id.* at PageID 357-58.)   He testified that anyone whose brain had been displaced by internal bleeding like this "would begin to experience symptoms within minutes of the bleeding and certainly within hours." (*Id.* at PageID 361-62.)   Marianne's swelling was so severe that Dr. Stevenson chose not to replace her skull after the surgery, instead waiting for a later date.

Dr. Stevenson then testified that Marianne's injury would normally occur after a motor vehicle accident or a fall from a significant height.   After explaining that he'd reviewed Marianne's medical history, Dr. Stevenson concluded that neither her VATER association nor her recent nasal fracture could have caused her injuries.   Indeed, Marianne was under constant supervision during her hospital stay from July 25th through August 3rd.   And he did not observe any old bleeds or clots during the surgery.   Surgeons look for these because evidence of old bleeding would influence both the procedure and the patient's prognosis.

The State called Dr. Makoroff, a practicing pediatrician who consulted on Marianne's case, next.   She testified that children who fall down steps, off kitchen counters, or from playground

equipment "don't have injuries like this." (*Id.* at PageID 404-05.) Nor would she expect retinal hemorrhaging like Marianne's to occur from an "accidental household fall[]." (*Id.* at PageID 455.) In her experience, injuries of this magnitude stem from car accidents, falls from second floor windows, or "abusive head trauma." (*Id.* at PageID 405.) Like Dr. Stevenson, she ruled out Marianne's VATER association and recent nasal fracture as possible causes. And she went one step more, ruling out a fall from Marianne's toddler bed onto the padded carpet in her room. Ultimately, Dr. Makoroff concluded, to a reasonable degree of medical certainty, that "abusive head trauma or physical abuse" caused Marianne's injuries. (*Id.* at PageID 419-20.)

Dr. Gray, a pediatric ophthalmologist who examined Marianne, also testified for the prosecution. He testified that Marianne had multi-layer hemorrhages behind each of her eyes, and that bleeds like these were usually caused by "severe" "head trauma." (*Id.* at PageID 464, 467.)

Jones presented no experts of his own at trial.

The jury convicted Jones and the trial court sentenced him to eight years in prison. The Ohio Court of Appeals' Second Appellate Division denied his merits appeal.

So Jones moved onto post-conviction proceedings, petitioning the Ohio state courts for relief from his sentence. He argued that his trial counsel's failure to obtain expert witnesses was ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). The trial court granted Jones an evidentiary hearing.

Jones presented his own expert witnesses for the first time at that hearing. Those experts tried to attribute Marianne's injuries to either pre-existing conditions or a fall from her bed. Dr. Robert Rothfeder owned his own medical practice for about twenty years. After retiring from medicine, Dr. Rothfeder began consulting full-time on lawsuits involving shaken baby syndrome. He estimated that he has testified in more than one hundred such cases. Over an objection from

the State, the court admitted Dr. Rothfeder as an expert in child abuse.[2] He opined, given Marianne's VATER association and recent nasal injury, that it was impossible "to conclude [to a reasonable degree of medical certainty] that [her] injuries were the result of child abuse." (R. 6-5, Post-Conviction Proceeding Tr., PageID 675.) And he asserted her retinal injuries didn't have any diagnostic value. But he couldn't rule out "unwitnessed head trauma." (*Id.* at PageID 668.)

Dr. Rothfeder's testimony, however, was not without issues. He erred, for example, during his testimony when he suggested that Marianne's blood was not clotting normally when she arrived at Cincinnati Children's. Referring to bloodwork from August 5th, the day of Marianne's head injuries, Dr. Rothfeder concluded that Marianne's blood couldn't clot properly, which "would have increased the rate of bleeding and the volume [of blood] that accumulated." (*Id.* at PageID 674.) But on cross examination, the State's attorney revealed that the bloodwork Dr. Rothfeder had cited was from 9:16 p.m. This was almost five hours after Marianne had arrived and after she had undergone a two-hour brain surgery. Dr. Rothfeder conceded that he made "a misstatement" and that Marianne's blood work was "normal" when Cincinnati Children's admitted her. (*Id.* at PageID 689.)

And Dr. Rothfeder made a second error when he misinterpreted Marianne's CAT scan. Dr. Rothfeder testified that her CAT scan showed both old blood and new blood. Old blood, because it was thinner than new blood, was a lighter color on the scan. The presence of old blood would suggest Marianne had reaggravated an older injury, for example, her earlier nasal fracture. But the prosecution's witness at the post-conviction hearing testified "that beyond a reasonable degree

---

[2] The federal magistrate judge speculated that Dr. Rothfeder may not have been able to qualify as an expert in federal court. The magistrate cited Dr. Rothfeder's lack of reference to "peer-reviewed scientific or medical journals" and potential bias, given his "devot[ion] to defense work in child abuse cases." (R.17, Mag. J. Op., PageID 1534-35.)

of medical certainty this is new blood and we had absolutely no reason to believe there's old blood in there and we have some evidence to suggest that there was no old blood in there." (R.6-6, Post-Conviction Proceeding Tr., at PageID 728.)

Jones also presented Kenneth Monson, a biomedical expert. Monson is a professor of mechanical engineering at the University of Utah. For his doctorate, he researched how blood vessels respond to trauma.

Professor Monson demonstrated familiarity with a wide range of academic literature. Researchers studying primates, crash test dummies, and model infants had investigated the level of force necessary to damage the brain without cracking the skull. But they have never conducted studies on live humans.

He drew two conclusions from the academic studies. First, "accelerations associated with shaking were . . . significantly lower than the thresholds of acceleration that are—that are necessary to produce injury." (R. 10, Monson Depo., PageID 1436.) And second, "even short drops produced acceleration levels that were considerably higher than those associated with shaking." (*Id.*)

But when asked about Marianne's case, Professor Monson couldn't offer a conclusion about what caused her injury. (*Id.* at PageID 1480 ("I can't actually draw an opinion on what—what caused [her injury].").) Except that he would not expect "a roll out of the bed . . . to cause these injuries." (*Id.* at PageID 1484.) And Professor Monson admitted he knew of instances when a defendant had confessed to shaking a child and inflicting injuries like Marianne's. Ultimately, his conclusion was simply that Marianne's injuries must have resulted from a "significant impact." (*Id.* at PageID 1483.)

The state called Dr. Robert Shapiro, a pediatrician at Cincinnati Children's Hospital, to rebut Jones' witnesses. Dr. Shapiro is board certified in pediatrics, child abuse pediatrics, and, until recently, pediatric emergency medicine. (R. 6-6, Post-Conviction Proceeding Tr., at PageID 705, 708.) He bluntly refuted the defense's suggestions that Marianne's other medical conditions or an accidental fall could've caused her injury:

- "I disagree that her medical complications and her medical condition contributed to or was the cause for her" injuries. (*Id.* at PageID 718.)

- "[A]s a physician[,] it would be irresponsible for me to suggest that [Marianne's] intracranial injury was a result of a short fall." (*Id.* at PageID 719.)

- "[A]s a responsible physician . . . any diagnosis other than child abuse would be rather difficult to come up with." (*Id.* at PageID 757.)

- Disputing, "[w]ithin a reasonable degree of medical certainty," the claim that Marianne's injury "could have been caused by . . . a short fall." (*Id.* at PageID 718.)

- Assenting to prosecutor's suggestions that Marianne's injury "indicated abusive head injury" "to a reasonable degree of medical certainty." (*Id.* at PageID 736.)

Over the course of Jones' trial and his post-conviction hearing, witnesses testified that sixteen medical professional associations recognize abusive head trauma as a diagnosis, including the American Academy of Pediatrics and the American Academy of Neurology. (*See* R.6-2, Trial Tr. at PageID 430; R. 6-6, Post-Conviction Proceeding Tr. PageID 734-35; R.8-1, Monson Depo., PageID 1466-67.)[3]

---

[3] The full list includes the American Academy of Pediatrics, American Academy of Ophthalmology and Strabismus, the American Academy of Family Physicians, the American College of Surgeons, the American Association of Neurological Surgeons, the Pediatric Orthopaedic Society of North American, the American College of Emergency Physicians, the Canadian Pediatric Society, the Royal College of Pediatrics and Child Health, the Royal College of Radiologists, the American Academy of Neurology, the Center of Disease Control, the World Health Organizations, the American Society of Ophthalmology, the Royal Society of Ophthalmology, and the National Academy of Medical Examiners.

Having heard this evidence, the trial court denied relief. The state appellate court affirmed, concluding that "Jones' post-conviction evidence [was] not sufficient to undermine our confidence in the outcome of his trial" given the differences in the prosecution's experts' greater first-hand exposure to Marianne's injuries and more significant clinical experience. (R.7, Ohio Ct. App. Post-Conviction Op., PageID 1171-72.)

Jones filed a habeas petition in federal court. He seeks relief for "constitutionally ineffective assistance of counsel at trial due to counsel's failure to secure and present medical expert and biomechanics expert testimony on shaken baby syndrome." (R.1, Habeas Petition, PageID 5.)

## II.

In habeas proceedings, we review the district court's legal conclusions de novo and its factual findings for clear error. *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009). In addition, and importantly, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs our review of habeas claims from state prisoners. AEDPA forbids federal courts from issuing a writ of habeas corpus unless the state court's adjudication of the prisoner's claim "was contrary to[] or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). This standard is "difficult to meet," "highly deferential," and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster,* 563 U.S. 181, 182 (2011) (internal quotations and citations omitted). The state court's conclusion, not its reasoning, receives this "AEDPA deference." *See Holland v. Rivard*, 800 F.3d 224, 235-36 (6th Cir. 2015) (citing *Harrington v. Richter*, 563 U.S. 86, 98 (2011)).

9

"Surmounting *Strickland*'s high bar is never an easy task." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "The [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

Because Jones' appeal touches both AEDPA and *Strickland* our review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). A state court has "latitude to reasonably determine that a defendant has not satisfied" *Strickland*. *Id.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). And then "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)) (internal quotation marks omitted).

Jones asserts that the state-level appellate decision rejecting his post-conviction appeal was just such an "unreasonable application" of *Strickland*. (Appellant's Br. at vii, 9.) "A decision is an unreasonable application of clearly established federal law . . . if 'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Mitchell*, 567 F.3d at 255 (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000)). We must deny Jones' claim unless "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" *Strickland*. *Harrington*, 562 U.S. at 102.

## III.

The only issue here is whether Jones was prejudiced by his trial counsel's failure to present Dr. Rothfeder and Professor Monson as expert witnesses. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("[A]rguments not raised in a party's opening brief . . . are waived.").

*Strickland* establishes a conjunctive two-part test for ineffective assistance of counsel. A criminal defendant's counsel must have performed below an objective standard of reasonable representation, and this performance must have prejudiced the petitioner. *See Strickland*, 466 U.S. at 687-96; *see also Mason v. Mitchell*, 543 F.3d 766, 772 (6th Cir. 2008) ("Claims of ineffective assistance of counsel have two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (citation and quotation marks omitted)). The Ohio appellate court held that Jones' counsel was deficient, and we express no opinion on that conclusion. Jones' appeal is about whether the representation he did receive prejudiced him.

Jones "must demonstrate a reasonable probability that, but for counsel's unprofessional errors," there was a "substantial" "likelihood of a different result." *Harrington*, 562 U.S. at 104, 111-12 (quotations and citations omitted). Our review of the Ohio Court of Appeals' opinion, and the record it interpreted, convinces us that it reasonably applied *Strickland*. "[S]ufficient conventional circumstantial evidence pointing to [petitioner's] guilt" can prevent a petitioner from establishing prejudice. *Harrington*, 562 U.S. at 113. "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

The circumstantial evidence of Jones' guilt is overwhelming. Marianne's operating surgeon testified that he associated injuries like hers with car accidents and falls from multi-floor heights. She was actively bleeding when her surgery started. Her swelling was so acute that the surgical team not only removed part of her skull to relieve pressure but they also delayed restoring it until her swelling subsided. She had bled through every layer of retinal tissue behind her eyes. First responders determined her injuries were so dire that they airlifted her *from an emergency room* to Cincinnati Children's because she needed a level of care they couldn't provide at the emergency room. This episode came two days after Marianne had recovered from an infection, and the hospital discharged her.

The defense offers no alternative account of how Marianne could've suffered these injuries. Dr. Rothfeder hadn't practiced medicine for over a year. He never examined Marianne; two of the prosecution's experts had. He made two errors in his testimony, misreading Marianne's bloodwork and CAT scan. The prosecution revealed the bloodwork error on cross-examination and vigorously disputed his reading of the CAT scan with Dr. Shapiro's testimony. Disputing these premises undermines Dr. Rothfeder's conclusion that, since Marianne's injuries were unobserved, "it[']s impossible to know exactly what" caused them. (R. 6-5, Post-Conviction Proceeding Tr., PageID 675.) And as the Ohio appellate court put it: "[A] fair reading of [Dr. Rothfeder's] entire testimony is that he would testify to that effect regardless of the medical aspects of this case because there was no witness to or admission about the mechanism of injury and in those circumstances he does not believe in the abusive head trauma/shaken baby diagnosis at all." (R.7, Ohio Ct. App. Post-Conviction Op., PageID 1169.)

Professor Monson's testimony was no more helpful. His conclusion, that a "significant impact" caused Marianne's injuries, failed to undermine the prosecution's conclusion, and it may have lent it implicit support.

In short, the state courts weighed Jones' experts against the cumulative testimony of three pediatricians and an ophthalmologist at Cincinnati Children's hospital and determined that Jones had not been prejudiced by this counsel's failure to present those experts at his trial. This was a reasonable application of *Strickland*. *See Strickland*, 466 U.S. at 694 ("The [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). So Jones has not met his burden to show "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" *Strickland*. *Harrington*, 562 U.S. at 102.

**IV.**

Jones' experts did not undermine the state courts' confidence in his trial, and they have not undermined ours either. We **AFFIRM**.